UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:19-CV-42-TBR

LAURA DRUMMOND,                                                    PLAINTIFF

v.

MURRAY-CALLOWAY COUNTY
PUBLIC HOSPITAL CORPORATION,                                       DEFENDANT

MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Murray-Calloway County Public Hospital Corporation ("Hospital"), [DN 36]. Plaintiff Laura Drummond filed a response, [DN 40], and the Hospital has replied, [DN 41]. This matter is therefore fully briefed and ripe for review. For the reasons set forth herein, the Court will grant in part and deny in part the Hospital's Motion for Summary Judgment, [DN 36].

I.      BACKGROUND

In 2010, the Hospital hired Drummond as a Licensed Practical Nurse ("LPN"). [DN 36-2, p. 2]. For the first several years of her employment, Drummond floated as needed between different physicians' offices within the Hospital. *Id.* at 2–3. Sometime in 2016, Drummond was assigned to work full time as an LPN in the Hospital's Oncology Department. *Id.* at 3.

In December 2016, Drummond was diagnosed with breast cancer. [DN 36-2, p. 5]. She requested and was approved for leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., so that she could receive the necessary cancer treatments. *Id.*; *see also*

[DN 36-3, pp. 3, 17]. She also applied for short term disability benefits to provide income during her unpaid FMLA leave. [DN 41-2, p. 3].

Drummond underwent surgery on March 27, 2017 and remained off work for several weeks. [DN 36-2, p. 6]. After an April 24, 2017 consultation with her treating physician, her return-to-work date was scheduled for May 8, 2017. [DN 36-2, p. 17] Her doctor advised that "she may work up to 8 hours daily as tolerated." *Id.* However, after another follow-up appointment on May 1, 2017, Drummond's return-to-work date was extended to May 15, 2017. *Id.* at 18. Her doctor again advised that "she may work up to 8 hours daily as tolerated." *Id.*

Sometime in late April or early May 2017—the exact date is not clear from the record[1]—Drummond received a letter from the Hospital advising that she had exhausted her FMLA leave. [DN 36-2, p. 6; DN 40-1, p. 5]. The letter explained that she could apply for extended leave if she was unable to return to work, but if she received such extended leave, her reinstatement would not be guaranteed. [DN 36-2, p. 7; DN 40-1, p. 5]. Drummond (and her treating physician) believed that she still had FMLA leave available. [DN 36-2, p. 7]. However, Drummond returned to the Hospital on May 15, 2017, believing that it was necessary to return to work to keep her job. *Id.* at 7, 9.

A few days after she returned to work, the Hospital advised Drummond that they had made a mistake when calculating her FMLA leave. *Id.* at 8–9. According to the revised calculations, Drummond still had approximately 160–170 hours of FMLA leave remaining. *Id.* at 9. Nevertheless, Drummond continued to work. *Id.* In her deposition, she explained that she

---

[1] The actual letter that Drummond received has not been provided to the Court, but the Hospital's practice was to notify employees when their FMLA leave expired. [DN 40-1, p. 5]. In her deposition, Drummond indicates that she asked her treating physician to release her for work after receiving such notice from the Hospital. [DN 36-2, pp. 7–8]. This suggests that she received the notice letter sometime in April 2017. However, an email between an HR agent and the Hospital's HR Director, in which the HR agent states that Drummond "has exhausted her FMLA entitlement," is dated May 10, 2017. [DN 40-17]; *see also* [DN 36-3].

"needed to keep my job, and I needed to be there," and "[t]hey were hounding me about needing me back." *Id.*

As noted above, Drummond was permitted to work "up to 8 hours daily as tolerated." [DN 36-2, p. 18] On at least one occasion, the Director of Clinic Operations advised Drummond to let someone know if she needed to leave work after eight hours, at which point she would be permitted to leave. [DN 36-2, p. 11]. However, Drummond testified that she sometimes worked more than eight hours because she was told by the Oncology Clinical Director that she was not allowed to go home, even after she reached her eight-hour limit. *Id.* at 11–12. She testified that her workdays "were generally a good eight hours or more every day most days." *Id.* at 12. Records indicate that Drummond notified her Office Manager of this issue sometime in June 2017. [DN 41-5]. The Office Manager acknowledged that Drummond had worked over eight hours on occasion and asked Drummond to provide an updated restriction letter from her treating physician, as the most recent letter on file was over thirty days old. *Id.*

Drummond took additional FMLA leave from August 10 to August 24, 2017 to undergo another surgery. [DN 36-3, p. 14]. On August 17, 2017, during this two-week leave, the Director of Clinic Operations emailed the Hospital's Human Resources ("HR") agent, asking if she "[had] any idea yet about [Drummond's] restrictions or time frame of her being out." [DN 41-3, p. 2]. The Director explained, "We are getting to the point that her being out so much is taking a negative impact on the daily task of the office. Not sure what is allowed such as: can we replace her? Do we have to have the same position open for her? Etc." *Id.* The HR agent explained that Drummond could not be "replaced" while on FMLA leave, and she must be employed in the same job or a "similar position" once she returns from FMLA leave. *Id.*

3

After Drummond exhausted her FMLA leave, the Hospital granted Drummond additional leave through its Extended Illness Leave policy. [DN 36-2, p. 15]. Drummond was on Extended Illness Leave from December 6, 2017 through February 28, 2018, to receive additional cancer treatments. [DN 36-3, p. 3]. Unlike the FMLA, the Extended Illness Leave policy does not entitle an employee to return to the same position that he or she held prior to taking leave. [DN 40-1, p. 5].

By early 2018, Drummond was eligible for FMLA leave again. She requested intermittent leave from March 2, 2018 through March 1, 2019 to receive ongoing cancer treatments. [DN 36-3, p. 3]. Then, in spring 2018, Drummond informed her supervisor that she would need an additional surgery, which she hoped to schedule for May or June of that year. [DN 40-10, p. 1]. Drummond also notified her supervisor that she would need approximately four weeks off to recover from the surgery, and she intended to use FMLA leave to do so. *Id.* Drummond's supervisor told her that, due to staffing issues, May or June was not an ideal time for her to be on leave. *Id.* at 2. As a result, Drummond scheduled her surgery for August 14, 2018. *Id.* On or about May 21, 2018, she advised her supervisor and the Hospital's Clinical Manager of the upcoming surgery date. *Id.*

On July 19, 2018, the Hospital notified Drummond and another LPN that it was eliminating the two LPN positions in the Oncology Department and, as a result, it was terminating the employment of Drummond and the other LPN. Multiple Hospital employees— including the Oncology Unit Practice Manager, the Human Resources Director, and the Director of Clinic Operations—testified and/or provided sworn affidavits regarding the reasoning behind this decision. *See* [DN 36-3, pp. 6–8; DN 36-4, pp. 2–6; DN 36-5, p. 2; DN 36-6; DN 36-7]. They explained that there had been concerns about the efficiency of the Oncology Department,

which employed LPNs, registered nurses ("RNs"), and medical assistants. *See, e.g.*, [DN 36-3, p. 6]. To increase efficiency, the Hospital decided to restructure the office such that the medical assistants checked patients in, while the RNs would attend to the patients. *See, e.g.*, *id.* This would prevent an LPN, who is limited in the duties he or she can perform, from attending to a patient for certain services, but then needing to find an RN to help with other procedures. *See, e.g.*, *id.* at 7.  For example, an LPN is not licensed to do a port draw (a common procedure in oncology), and would therefore have to leave the patient, find an RN, and bring the RN to the patient to complete the port draw. *See, e.g.*, [DN 36-4, p. 6; DN 36-7, p. 2]. According to the Hospital, the goal of restructuring the Oncology Department was to eliminate this issue, thereby improving "patient flow" and the quality of patient care. *See, e.g.*, [DN 36-4, p. 2; DN 36-3, p. 8; DN 36-7, p. 2].  The Hospital therefore terminated both LPN positions within the Oncology Department. Drummond ultimately applied for at least two other LPN openings within the Hospital, but she was not hired for either position. [DN 36-2, p. 16]. She alleges that she was not hired for either position because the Hospital provided the hiring manager with an inaccurate and incomplete copy of her personnel record, and the hiring managers knew that she intended to take FMLA leave in the near future. [DN 40, p. 10].

On March 1, 2019, Drummond filed suit against the Hospital in Calloway Circuit Court. [DN 1-1]. In her complaint, she alleges that the Hospital violated the FMLA by interfering with her right to FMLA-protected leave and retaliating against her for exercising her rights under the FMLA. *Id.* at 4–5. She further alleges that the Hospital violated the Kentucky Civil Rights Act ("KCRA"), KRS § 344, et seq., by failing to provide her with reasonable and necessary accommodations—namely, the ability to work no more than eight hours a day. [DN 1-1, pp. 5–6]. Lastly, Drummond alleges that the Hospital violated the Kentucky Wage and Hour Act

("KWHA"), KRS § 337, et seq., when it failed to provide her with a duty-free lunch break. [DN 1-1, p. 6]. For these various alleged violations, Drummond seeks compensatory damages and attorney's fees and costs. *Id.* at 6–7. She also seeks liquidated damages for the FMLA and KWHA violations. *Id.* at 7.

On March 28, 2019, the Hospital removed the matter to this Court. [DN 1] Discovery is complete, and the Hospital now moves for summary judgment on each count. [DN 36]. The matter has been fully briefed. [DN 36; DN 40; DN 41]. For the reasons set forth below, the Court will grant in part and deny in part the Hospital's Motion for Summary Judgment, [DN 36].

## II.   STANDARD OF REVIEW

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In reviewing a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party; however, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must present specific facts showing that a genuine factual issue exists by "citing to particular

parts of materials in the record" or by "showing that the materials cited do not establish the

absence . . . of a genuine dispute[.]" Fed.R.Civ.P. 56(c)(1). "The mere existence of a scintilla of

evidence in support of the [non-moving party's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477

U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the

nonmoving party, then there is no genuine issue of material fact and summary judgment is

appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

### A.  The Family Medical Leave Act Claims (Count I)

Under the FMLA, an eligible employee is entitled to a total of twelve weeks of leave

during a twelve-month period if the employee suffers from a "serious health condition that

makes the employee unable to perform the functions of the position of such employee." 29

U.S.C. § 2612(a)(1)(D). Any employee who timely returns from such leave is entitled "to be

restored by the employer to the position of employment held by the employee when the leave

commenced" or "to be restored to an equivalent position with equivalent employment benefits,

pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A)–(B). However, the

employee is not entitled to "any right, benefit, or position of employment other than any right,

benefit, or position to which the employee would have been entitled had the employee not taken

the leave." *Id.* § 2614(a)(3)(B).

In addition to these protections, the FMLA prohibits any employer from "interfer[ing]

with, restrain[ing], or deny[ing] the exercise of or attempt to exercise, any right provided" by the

FMLA. *Id.* § 2615(a)(1). The Act further prohibits an employer from "discharg[ing] or in any

other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA. *Id.* § 2615(a)(2). These provisions are enforceable through § 107 of the FMLA, which imposes liability on an employer that violates these provisions and provides an individual right of action to the complaining employee. 29 U.S.C. § 2617(a)(1)–(2). Thus, "[t]his court recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006) (quoting *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)) (internal quotation marks omitted). In the present case, Drummond invokes both theories, and the Court addresses each in turn.

### 1. Interference

As noted above, the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). In this case, Drummond argues that the Hospital interfered with her FMLA rights when it incorrectly informed her that her FMLA leave had been exhausted. [DN 40, pp. 12–14]. To prove such a claim, Drummond must demonstrate that "(1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) [she] was entitled to leave under the FMLA; (4) [she] gave the employer notice of her intention to take leave; and (5) the employer denied [her] FMLA benefits to which she was entitled." *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

Under this interference theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th

Cir. 2006) (quoting *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003) (internal quotation marks omitted). Thus, "[t]he employer's intent is not a relevant part of the [interference] inquiry." *Id.* at 507 (citing *Arban*, 345 F.3d at 401). However, "[b]y the same token, the FMLA is not a strict-liability statute." *Id.* (citations omitted). An employee seeking relief under the interference theory must therefore demonstrate "that the employer's violation caused them harm." *Id.* at 508 (citation omitted). Stated another way, the interference theory "provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 82 (2002). Generally, an employee can show prejudice by demonstrating that "had she been properly informed of her FMLA rights, she could have structured her leave differently." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 323 (3d Cir. 2014) (citations omitted).

In its Motion for Summary Judgment, the Hospital does not dispute that Drummond was an employee eligible under the FMLA, the Hospital was an employer under the FMLA, Drummond was entitled to FMLA leave, and she requested such leave. [DN 36, pp. 6–7]. It therefore appears that the first four elements of an interference claim are satisfied. With respect to the final element of an interference claim—that "the employer denied the employee FMLA benefits to which she was entitled," *Killian*, 454 F.3d at 556 (citation omitted)—the Hospital makes two arguments. First, the Hospital appears to argue that there was no violation because Ms. Drummond was granted FMLA leave, she "was never required to work on leave, nor was she required to return to work early," and she was granted additional leave through the Hospital's Extended Illness Leave policy, even after her FMLA leave expired. [DN 41, p. 3]. Next, the Hospital argues that, even if it interfered with Drummond's FMLA rights by improperly

notifying her that her leave had expired, Drummond cannot demonstrate any prejudice. *Id.* at 3–4.

With respect to the first argument, the Hospital states that, under Sixth Circuit precedent, "the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." [DN 41, p. 3 (quoting *Allen v. Butler County Com'rs*, 331 F. App'x 389, 394 (6th Cir. 2009)) (internal quotation marks omitted)]. In the Sixth Circuit cases cited by the Hospital, the Court held that "interference with an employee's FMLA rights does not constitute a violation *if the employer has a legitimate reason unrelated to the exercise of FMLA*." *Edgar*, 443 F.3d at 508 (citation omitted) (emphasis added); *see also Allen*, 331 F. App'x at 394 (discussing *Edgar*). Stated another way, the mere occurrence of interference is not necessarily an FMLA violation— *if* the employer had an unrelated and legitimate reason for the interference. In this case, however, the Hospital has not articulated any legitimate reason for incorrectly notifying Drummond that she exhausted her FMLA leave. Instead, the Hospital acknowledges that "Drummond was incorrectly notified that her FMLA leave had exhausted prematurely." [DN 36-1, p. 7]. As a result of that notification letter, Drummond returned to work earlier than she had anticipated. [DN 36-2, pp. 7, 9].  At the very least, then, the Hospital's miscalculation temporarily deprived Drummond of her remaining hours of FMLA leave. *See generally Jones v. Sharp Manufacturing Company of America*, No. 2:14-cv-03020-STA-tmp, 2016 WL 2344228, *13–14 (W.D. Tenn. May 3, 2016) (finding employer interfered with employee's FMLA rights by improperly calculating her leave entitlement); *Bertrand v. City of Lake* Charles, No. 2:10-CV-867, 2012 WL 1596706, *5–6 (W.D. La. May 3, 2012) (same).

Having determined that the Hospital interfered with Drummond's FMLA rights, the Court turns to the question of prejudice. Drummond acknowledges that "at some point" the

Hospital corrected its records to reflect Drummond's accurate FMLA leave hours. [DN 40, p. 14]. However, Drummond argues that "by the time [the Hospital] finally acknowledged its error and advised Drummond that she had not exhausted her FMLA leave, Drummond had returned to work." *Id.* As a result, she argues, she "lost the opportunity to recover from cancer surgery at home" and "further lost the opportunity to recover with income from her short-term disability benefits" because she would have to serve a ten-day unpaid waiting period before said disability benefits were reinstated. *Id.* Thus, she argues, she suffered actual damages as a result of the Hospital's interference.

The Court first addresses Drummond's argument that she was deprived of her short-term disability benefits by returning to work earlier than she intended. Drummond testified to her belief that her short term disability "cancelled the minute [she] walked back in the door," and argues that "once she returned to work, she could not obtain those benefits without serving another 10-day unpaid waiting period." [DN 40, p. 14]. However, Drummond does not cite to any evidence to support this assertion. In response, the Hospital has provided an affidavit of its Human Resources Director, who provides details about the Hospital's short-term disability plan. [DN 41-2]. Under that plan, a recurrent disability is treated as a continuation of the employee's previous, related disability. *Id.* As a result, there is no waiting period for those benefits. *Id.* Thus, if an employee becomes disabled, ceases to be disabled, then becomes disabled again for the same or a related condition, that employee does not have to wait through a new "elimination period," or waiting period. *Id.* As previously noted, Drummond does not present any evidence to support her assertion that she would be required to wait through a ten-day unpaid waiting period before receiving her short-term disability benefits again. Even viewing the evidence in the light most favorable to Drummond, there is simply no evidence of record to support that argument.

11

The Court next turns to Drummond's argument that she was deprived of the ability to recover at home. On this point, the Court notes that Drummond's physician released her to return to work on May 15, 2017, and she returned to work on that date. *See, e.g.*, [DN 36-2, p. 17]. When the Hospital realized its mistake and notified Drummond that she was still entitled to an additional 160–170 hours of FMLA leave, she did not immediately utilize that leave and instead continued to work. *Id.* at 9. It appears that those remaining hours were utilized later in the year. For example, Drummond took additional FMLA leave from August 10 to August 24, 2017. *Id.* at 14. At first glance, then, this evidence suggests that Drummond was *not* prejudiced by the Hospital's miscalculation. After all, she returned to work on the day that her doctor released her to do so, and she chose to continue working rather than take her remaining FMLA leave hours once she was notified of the Hospital's error. Moreover, she was eventually able to use her remaining FMLA leave hours.

Notably, however, it is possible to show prejudice where the employee receives her full allotment of FMLA leave. *See Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 525 (6th Cir. 2015) (identifying "several scenarios in which an employee could show prejudice even after having exhausted her FMLA-allotted leave hours"). For example, "[p]rejudice can be demonstrated where the employee can show that he or she was denied any benefit to which they would have been entitled." 13 Am. Jur. *Trials* § 317 (2013) (citation omitted). "An employee fails to establish prejudice if the employee admits that he or she would not have done anything differently if the interference had not occurred or admits that the denial of FMLA leave did not affect the ability to take additional leave in the future." *Id.*

In this case, the evidence of record suggests that Drummond would have utilized her remaining FMLA leave hours to continue her recovery at home, had she not been improperly

12

notified that her hours had been exhausted. For example, in her deposition, Drummond explains

that she "went back [to her physician] and asked to be released early, because [she] was told that

[she] had to come back to work." [DN 36-2, p. 7]. She further explains that, at that time, she was

suffering from post-surgery complications, like bleeding and respiratory distress. *Id.*  She states,

"I wasn't released by my doctor at that time due to his feeling it was time to go back," but rather,

"I asked to be released, because I got a letter saying I had to come back." *Id.*; *see also id.* at 8.

After returning to work and being notified of the Hospital's error, Drummond continued to work,

not because she felt physically ready but because she "had to." *Id.* at 9. She explained, "I also

had to keep my job, and I needed to be there. They were hounding me about needing me back"

through texts, phone calls, and in-person conversations. *Id.*

  At this stage of the proceedings, the Court views the evidence in the light most favorable

to Drummond. *Matsushita*, 475 U.S. at 586 (1986). With this standard in mind, the Court finds

that there exists sufficient evidence upon which a reasonable jury could find that Drummond

only returned to work because she received the Hospital's notification letter, at which point she

asked her doctor to write a letter releasing her to work. From this evidence, a reasonable jury

could conclude that Drummond would not have returned to work on May 15, 2017 but for her

receipt of the notification letter. There is therefore evidence that Drummond restructured her

FMLA leave based on the Hospital's incorrect calculation. The Court also notes that there is

evidence that Drummond would have utilized her remaining FMLA leave upon learning of the

Hospital's error, but that she was pressured to continue working. Other courts have found that

such evidence can support an interference claim. *See Bravo v. Union County*, No. 12-2848

(DRD), 2013 WL 2285780, *9 (D. N.J. May 23, 2013) ("[D]iscouraging an employee from

taking FMLA leave may result in prejudice by inhibiting the employee from asserting their

FMLA rights in the future." (citations omitted)); 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

In sum, the Court concludes that there is sufficient evidence of the Hospital's interference with Drummond's FMLA rights, as well as evidence of prejudice—even disregarding Drummond's short-term disability argument. Thus, a reasonable jury could rule in favor of Drummond on this claim. The Court will therefore deny the Hospital's Motion for Summary Judgment to the extent it seeks summary judgment on Drummond's FMLA interference claim.

### 2. Retaliation

Drummond also argues that the Hospital retaliated against her for requesting additional FMLA leave by terminating her employment. [DN 40, pp. 14–15]. When considering this FMLA retaliation claim, the Court must apply the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Edgar*, 443 F.3d at 508 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313–16 (6th Cir. 2001)). Under that test, Drummond bears the initial burden of proving her prima facie case by a preponderance of the evidence. *Killian*, 454 F.3d at 556 (citing *Arban*, 345 F.3d at 404); *see also Edgar*, 443 F.3d at 508; *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Once she does so, "the burden shifts to the [Hospital] to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Edgar*, 443 F.3d at 508 (citation omitted). If the Hospital articulates a legitimate and nondiscriminatory reason for terminating Drummond, the burden then shifts back to Drummond to prove by a preponderance of the evidence that the proffered reason "is in reality a pretext to mask discrimination." *Skrjanc*, 272 F.3d at 315; *see also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (explaining the *McDonnell Douglas* burden-shifting test).

### a.   Drummond's Prima Facie Case

To make a prima facie showing of retaliation, Drummond must demonstrate that "(1) she availed herself of a protected right under the FMLA by notifying [the Hospital] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar*, 443 F.3d at 508 (citations omitted). The parties do not dispute that the first two elements are satisfied; however, the Hospital argues Drummond cannot prove a causal connection between her request for FMLA leave and her termination.

With respect to this element of causation, Drummond "must show that the employer's stated reason for terminating her was pretextual and that the true reason for her dismissal was her medical leave." *Killian*, 454 F.3d at 556 (citing *Arban*, 345 F.3d at 404). Thus, the retaliation theory differs from the interference theory because, under the retaliation theory, "the employer's motive *is* an integral part of the analysis." *Edgar*, 443 F.3d at 508 (citation omitted). As the Sixth Circuit has explained, "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 885 (7th Cir. 2005)).

The Hospital argues that Drummond cannot prove a prima facie case of retaliation because she relies only on the temporal proximity of her discharge and her FMLA leave, and "[t]emporal proximity alone is insufficient to show causation or pretext." [DN 36-1, p. 8 (citing *Skrjanc*, 272 F.3d at 317)]. The Hospital misstates the law. As discussed in more detail below, temporal proximity alone cannot establish pretext; however, temporal proximity is sufficient to establish the causation element of a plaintiff's prima facie case. *See Seeger v. Cincinnati Bell*

*Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). On this point, it is important to note that "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Id.* at 283 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)) (internal quotation marks omitted). Simply stated, "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc*, 272 F.3d at 315 (citation omitted).

The Court finds that, based on the evidence of record, the nearness in time between Drummond's May 21, 2018 request for additional FMLA and her July 19, 2018 termination— less than two months—meets the low threshold of proof necessary to establish a prima facie case of retaliatory discharge. *See Seeger*, 681 F.3d at 283 (finding that prima facie case has been established where period of two months passed between employee's notice of FMLA leave and his termination); *Clark v. Walgreen Co.*, 424 F.App'x 467, 473–74 (6th Cir. 2011) (citation omitted) (same); *Bryson v. Regis Corp.*, 489 F.3d 561, 571 (6th Cir. 2007) (finding causation element satisfied when three months passed between employee's notice of FMLA leave and her termination).

### b.   Nondiscriminatory Rationale

Because Drummond has proven her prima facie case, "the burden shifts to the [Hospital] to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Edgar*, 443 F.3d at 508 (citation omitted). On this point, the Hospital argues that it has successfully articulated a legitimate and nondiscriminatory reason for terminating Drummond—namely, the restructuring of the Oncology Department to improve patient care. [DN 36-1, p. 8]. Stated another way, the Hospital argues that it would have taken the same adverse action against

Drummond, even if she had never requested FMLA leave. *Id.* at 9. Drummond does not dispute that the Hospital has satisfied its burden of articulating a non-retaliatory explanation, and the Court agrees that the Hospital has satisfied its burden.

### c.   Evidence of Pretext

The burden now shifts back to Drummond to prove by a preponderance of the evidence that the Hospital's proffered reason "is in reality a pretext to mask discrimination." *Skrjanc*, 272 F.3d at 315. Drummond can establish such pretext by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Clark*, 424 F.App'x at 473–74 (citation omitted); *see also Seeger*, 681 F.3d at 285 (citation omitted).  Drummond appears to rely on the second method and argues that the stated reason for her termination—the restructuring of the department—was not the actual reason for the termination.

As the plaintiff, Drummond "bears the burden of producing sufficient evidence from which the jury could reasonably reject [the Hospital's] explanation and infer that the defendant[] intentionally [retaliated] against [her]." *Seeger*, 681 F.3d at 285 (quoting *Clark*, 424 F.App'x at 474) (internal quotation marks omitted). She need not offer direct evidence that the Hospital fired her because she intended to take FMLA leave; rather, she can meet her burden by producing circumstantial evidence—i.e., evidence tending to show that the Hospital's stated explanation for her termination is false. *Skrjanc*, 272 F.3d at 315–16 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). Further, at this stage of the proceeding, Drummond needs only to "create a *genuine issue* as to whether the [Hospital's] rationale is pretextual." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019)

(quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)) (internal quotation marks omitted).

The Hospital argues that there is no genuine issue with respect to pretext because temporal proximity, without more, is insufficient to prove pretext. [DN 36-1, p. 11]. The Hospital correctly states the law. "Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)); *see also Wyatt v. Nissan North America, Inc.*, 999 F.3d 400, 421 (6th Cir. 2021). Nevertheless, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Seeger*, 681 F.3d at 285 (quoting *Bell v. Prefix, Inc.*, 321 F.App'x 423, 431 (6th Cir. 2009)) (internal quotation marks omitted).

In the present case, the Court finds that there is sufficient evidence available for a reasonable jury to find that the Hospital's proffered explanation was merely pretext for retaliation. First, the Court notes the temporal proximity between Drummond's FMLA leave in 2017, her intermittent FMLA leave in 2018, her request for additional FMLA leave on or about May 21, 2018, and her termination on July 19, 2018. While her initial FMLA leave request was in early 2017, she continued to utilize FMLA leave throughout 2017 and 2018 before finally providing notice that she would need at least four more weeks off work for an additional surgery. She provided this notice on or about May 21, 2019—less than two months before she was terminated. At the very least, the timing of these events is suspicious.

As noted above, however, "temporal proximity cannot be the sole basis for finding pretext." *Seeger*, 681 F.3d at 285 (quoting *Donald*, 667 F.3d at 763) (internal quotation marks omitted). But in this case, there is other independent evidence upon which a jury could rely. For

example, on August 17, 2017, while Drummond was on FMLA leave, the Director of Clinic Operations emailed the Hospital's HR agent, asking if she "[had] any idea yet about [Drummond's] restrictions or time frame of her being out." [DN 41-3, p. 2]. The Director explained, "We are getting to the point that her being out so much is taking a negative impact on the daily task of the office. Not sure what is allowed such as: can we replace her? Do we have to have the same position open for her? Etc." *Id.* The Director was ultimately advised that it would not be possible to replace Drummond while she was on FMLA leave, and she would be entitled to return to the same position, or a similar position. *Id.*

While there could be two different conclusions from this evidence, a reasonable jury could conclude that the Hospital did not want Drummond to utilize her FMLA leave because it had a "negative impact" on the Oncology Department. A reasonable jury could also conclude that, based on this email exchange, the Hospital knew that it could not terminate Drummond while she was on FMLA leave, and the Hospital was therefore motivated to terminate her prior to her intended leave in August 2019.  Of course, there is also evidence that Drummond received additional leave after the August 2017 email exchange, including leave through the Hospital's own Extended Illness Leave policy, which does not provide the same job protection as the FMLA. During that leave, Drummond could have been terminated, but the Hospital took no such action. From this, a reasonable jury might conclude that the Hospital no longer had any issue with Drummond's absences, and her leave request was therefore not a factor in her termination. *See* [DN 41, pp. 7–8 (arguing that Drummond could have been replaced between December 11, 2017 and January 15, 2018 while on the Extended Illness Leave policy)]. However, at this stage of the proceeding, this remains a genuine dispute of material fact that should be resolved by a jury.

Moreover, the Hospital's explanation for Drummond's termination is supported primarily, if not exclusively, by the testimony of its employees. *See* [DN 36-3, pp. 6–8; DN 36-4, pp. 2–6; DN 36-5, p. 2; DN 36-6; DN 36-7]. To the extent a fact-finder must judge the credibility of these testifying employees to determine the legitimacy of the Hospital's explanation, that task should be left to a jury. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Lastly, the Court addresses the Hospital's argument that "courts cannot second guess management decisions regarding the need or the timing of a reorganization." [Dn 36-1, pp. 11–12 (citing *Zechar v. Ohio Dep't of Educ.*, 782 N.E.2d 163, 168–69 (Ohio Ct. of Cl. 2002)). To be clear, this Court is not second-guessing or criticizing the Hospital's decision to restructure the Oncology Department. Rather, at this stage of the proceedings, the Court is merely concluding that the temporal proximity of Drummond's FMLA leave request and her termination, in conjunction with the other evidence cited above, could lead a reasonable jury to conclude that the Hospital's stated explanation for Drummond's termination was merely pretextual.

In sum, the suspicious timing of Drummond's termination, coupled with the other evidence discussed above, makes it such that a jury would need to weigh the evidence and make credibility determinations to determine whether the Hospital's proffered explanation motivated Drummond's termination or whether the Hospital was actually retaliating against Drummond for requesting FMLA leave. In other words, the Court finds that a genuine dispute of material fact exists with respect to Drummond's FMLA retaliation claim. The Court will therefore deny the Hospital's Motion for Summary Judgment on that count.

### B.  The Kentucky Civil Rights Act Claim (Count II)

Under the KCRA, "it is unlawful for an employer to discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because the person is a 'qualified individual with a disability.'" *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706 (Ky. App. 2004); *see also* KRS § 344.040(1). Drummond argues that the Hospital violated the KCRA when it failed to accommodate her disability and forced her to work more than eight hours a day. [DN 40, p. 21].  Thus, Drummond is asserting a failure-to-accommodate discrimination claim. *See Webb v. Humana, Inc.*, 819 F.Supp.2d 641, 645–48 (W.D. Ky. 2011) (explaining the differences between a failure-to-accommodate claim and a disparate treatment claim). When considering this claim, the Court again turns to the *McDonnell Douglas* burden-shifting test. *See Brooks v. Lexington-Fayette Urban County Housing Auth.*, 132 S.W.3d 790, 797 (2004).

Under the *McDonnell Douglas* analysis, Drummond bears the initial burden of proving her prima facie case of discrimination. *Id.* (citation omitted). Generally, Drummond may satisfy this burden by demonstrating "(1) that [she] had a disability as that term is used under the statute . . . ; (2) that [she] was 'otherwise qualified' to perform the requirements of the job, with or without reasonable accommodation; and (3) that [she] suffered an adverse employment decision because of the disability." *Hallahan*, 138 S.W.3d at 706–07 (citations omitted). If she proves her prima facie case, the burden then shifts to the Hospital to articulate a legitimate and non-discriminatory reason for its actions. *See Charalambakis v. Asbury University*, 488 S.W.3d 568, 577 (Ky. 2016) (quoting *Williams v. Wal–Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005)). At that point, the burden shifts back to Drummond to prove that the Hospital's stated explanation was merely a pretext for intentional disability discrimination. *Id.* at 578 (citing *Williams*, 184 S.W.3d at 497).

The Hospital does not dispute that Drummond suffered from a disability as defined by the KCRA. Rather, the Hospital argues that Drummond cannot make out a prima facie case of failure-to-accommodate discrimination because "no one at [the Hospital] required her to work beyond 8 hours," and she was otherwise permitted to take FMLA leave. [DN 36-1, p. 15–16]. The Hospital concludes that it "reasonably accommodated Ms. Drummond's alleged disability by allowing her to take FMLA leave to undergo treatment, and by allowing her to leave work after 8 hours, when necessary." *Id.* at 16. However, this argument overlooks Drummond's deposition testimony. Drummond testified in her deposition that she was *not* permitted to leave work after reaching her eight-hour limit. [DN 36-2, pp. 11–12]. When asked if she worked more than eight hours because she was "able to handle it," Drummond responded, "Incorrect." *Id.* at 11. She explained that she did not leave after eight hours "[b]ecause they wouldn't let [her] go home," and the Oncology Department's Clinical Director "refused to allow [her] to leave" after eight hours. *Id.* at 12.

In its response brief, the Hospital again fails to address this portion of Drummond's deposition testimony. Instead, the Hospital points to time records showing that Drummond worked less than eight hours more often than she worked more than eight hours. [DN 41, pp. 9–11; DN 41-4]. Then, without any additional support, the Hospital concludes that "[c]ontrary to Ms. Drummond's assertions, her time records show [the Hospital's] overwhelming adherence to the 8-hour restriction, exceeded only when Ms. Drummond desired to do so, and the complete absence of any threat of repercussion for leaving work when she felt it appropriate, if necessary." *Id.* at 11.

This argument again completely fails to acknowledge Drummond's deposition testimony. The time records show only the hours that Drummond worked; they provide no insight into why

she worked beyond eight hours on any given day, nor do they prove an "absence of any threat of repercussion for leaving work," as the Hospital alleges. *See id.* Drummond's deposition testimony, on the other hand, provides evidence that Drummond was expressly told by a Hospital employee that she must stay and continue to work past her eight-hour limit. [DN 36-2, pp. 11–12]. The time record show that Drummond did, in fact, work over eight hours on multiple occasions. *See* [DN 41-4].

Thus, while there is no dispute that Drummond worked more than eight hours a day on multiple occasions, there is clearly a genuine dispute of material fact with respect to whether Drummond was forced to work more than eight hours a day, or whether she chose to do so. The Court will therefore deny the Motion for Summary Judgment as to Count II, the KCRA Claim.

### C.  The Kentucky Wage and Hour Act Claim (Count III)

In her response, Drummond concedes her KWHA claim regarding unpaid lunch breaks. [DN 40, p. 24]. Specifically, Drummond states that she "does not challenge Defendant's motion for summary judgment on her claim that [the Hospital] violated KRS 337," the KWHA. *Id.* Accordingly, the Court will grant summary judgment in favor of the Hospital on Count III, the KWHA claim.

### IV.    CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that Defendant's Motion for Summary Judgment, [**DN 36**], is **GRANTED IN PART** and **DENIED IN PART**. Said Motion is granted to the extent it seeks summary judgment on Count III, Plaintiff's KWHA claim. Said Motion is denied to the extent it seeks summary judgment on Count I, the FMLA claims, and Count II, the KCRA claim. A separate judgment will follow.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

November 10, 2021

23

cc Counsel